Adam Alba (13128)
 alba@mcg.law
Magleby Cataxinos & Greenwood, P.C.
141 W. Pierpont Avenue
Salt Lake City, Utah 84101
Telephone: (801)-359-9000

*Attorney for Plaintiffs*
*(additional counsel on signature page)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| LORI TESKE and TERRI FRANKLIN | **PROPOSED CLASS ACTION** |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| PAPARAZZI, LLC, MISTY KIRBY, TRENT KIRBY, CHANTEL REEVE, and RYAN REEVE | **JURY DEMANDED** |
| | Case No.  4:22-cv-35-DN |
| Defendants. | Honorable David Nuffer |

**NATURE OF THE ACTION**

1.      This is a case about a multilevel-marketing company that used a nationwide network of sellers, or "Consultants," to peddle low-budget jewelry and accessory items laced with high levels of toxic contaminants, first to its national network of sellers, who were then saddled with huge amounts of unsellable and dangerous products. Paparazzi, LLC[1] falsely represented to its sellers, known as "Consultants" within the company, that its jewelry and accessories were "lead and nickel free" and were in compliance with state rules limiting the amount of dangerous toxins in consumer products. Nothing could be further from the truth.

---

[1] Paparazzi, LLC, its members, and its cofounders, are collectively referred to herein as simply "Paparazzi."

Unknown to Paparazzi's Consultants, Paparazzi's jewelry contains astonishingly high levels of lead, nickel, cadmium, and/or other toxic metals.[2]

2.      As a multi-level marketing company, Paparazzi recruits individuals to enlist as Consultants and sell Paparazzi products to their friends, neighbors, family members, coworkers, and others, in exchange for commissions, bonuses, and incentive awards based on their sales.

3.      At Paparazzi's urging, Consultants invest substantial sums of money to build up their inventory of Paparazzi costume jewelry inventory.

4.      As recently as November 2021, Paparazzi advertised its products to Consultants and consumers as lead-free and nickel-free. And as recently as December 2021, Paparazzi advertised its products to Consultants and consumers as compliant with California's Proposition 65, which, as discussed further below, requires disclosures if certain levels of numerous toxic substances—including lead, nickel, and cadmium—meet or exceed a threshold amount, depending on the substance.

5.      In fact, as laboratory testing has since confirmed, Paparazzi's products are not lead-free, nickel-free, or otherwise free of Toxic Metals. They often contain substantial, and in some cases shockingly high and potentially toxic, levels of lead, nickel, and other toxic metals like cadmium that are hazardous to human health.

6.      Paparazzi has induced its Consultants, including Plaintiffs and Class members, into purchasing large quantities of Paparazzi jewelry to sell to their consumers. Not only does the Paparazzi jewelry fail to live up to the quality and safety representations Paparazzi has made about its products, it poses health and safety risks to Consultants and their customers. Paparazzi

---

[2] Collectively, the dangerous substances of lead, nickel, cadmium, and other toxic metals are herein referred to as "Toxic Metals."

has reaped massive profits from these sales, while Consultants are saddled with worthless, potentially dangerous goods.

7.      Plaintiffs and Class members bring this action to recover money damages for the harms Paparazzi has caused through its misrepresentations and deceptions about the composition, quality, and safety of Paparazzi products.

8.      All allegations are based upon personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to the acts of others.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and (d) because Plaintiffs are citizens of a different state than Defendant, there are more than 100 Class members nationwide, and the amount in controversy exceeds $5,000,000 exclusive of costs and interest.

10.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims under the Lanham Act, 15 U.S.C. § 1125.

11.     This Court has personal jurisdiction over Paparazzi, LLC because all its members and its co-founder defendants reside in the State of Utah and in this district. Moreover, Paparazzi is authorized to do business in this District and conducts substantial business in this District.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because all of Paparazzi, LLC's members resides in this district. Additionally, Paparazzi has marketed, advertised, and sold Paparazzi jewelry within this district.

## PARTIES

### I.   Plaintiff Lori Teske

13.     Lori Teske is a resident of Oregon. She signed up to be a Paparazzi Consultant on October 24, 2020.

14.     Paparazzi's promises that its products were lead- and nickel-free were an important draw for her in deciding to become a consultant.

15.     Ms. Teske began to have suspicions that the jewelry was not safe when, after purchasing Paparazzi jewelry, she began experiencing headaches and vertigo for the first time in her life.

16.     When she learned, in late 2021, that the Paparazzi costume jewelry pieces she bought were not as advertised and were potentially dangerous, she decided to stop selling the jewelry she bought from Paparazzi.

17.     Ms. Teske ultimately spent more than $18,000 on purchases of Paparazzi jewelry through November 2021 and sold approximately $5,000 of what she purchased. She does not want to sell harmful products to anyone, and does not want anything to do with dangerous products getting into the hands of children. Her unsold Paparazzi jewelry is packaged and sitting in her home. She is not even sure whether or how she can safely dispose of it.

## II.   Plaintiff Terri Franklin

18.     Terri Franklin is a resident of Louisiana. She signed up to be a Paparazzi Consultant on June 30, 2019.

19.     In October 2021, Ms. Franklin learned that Paparazzi jewelry was potentially toxic.

20.     Because Ms. Franklin did not want to be involved in selling dangerous goods to anyone, she stopped selling Paparazzi jewelry in October 2021 despite the fact that she had (and still has) over 5,000 pieces of Paparazzi jewelry still in her possession.

21.     At a cost of approximately $2.75 per jewelry item, Ms. Franklin has over $13,500 in Paparazzi jewelry inventory that remains unsold.

22.    Ms. Franklin takes pains to keep her remaining inventory as far away as possible from where her grandson sleeps, whether it be in her basement, a storage shed, or closet space.

23.    Ms. Franklin attempted to contact Paparazzi to buy back her unsold inventory, but she received no response.

## III.    <u>Defendants</u>

24.    Defendant Paparazzi, LLC is a Utah limited liability corporation with its principal place of business at 36 N 1000 W, Hurricane, Utah. Paparazzi LLC's members are Misty Kirby, an individual residing in the State of Utah, Trent Kirby, an individual residing in the State of Utah, and Chantel Reeve, an individual residing in the State of Utah. Therefore, Paparazzi LLC is a resident of Utah.

25.    Defendant Misty Kirby is a co-founder of Paparazzi. Misty Kirby is a resident and citizen of the State of Utah. Upon information and belief, Misty Kirby knew of the aforementioned and undermentioned false representations of quality and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel.  Upon information and belief, Misty Kirby had significant authority in the management and decision making that led to the sale of Paparazzi's products with dangerous levels of lead and nickel. Despite this knowledge, Defendant Misty Kirby disregarded those dangers, unjustly enriching herself through the multilevel-marketing compensation structure of Paparazzi.

26.    Defendant Trent Kirby is a co-founder of Paparazzi. Trent Kirby is a resident and citizen of the State of Utah. Upon information and belief, Trent Kirby knew of the aforementioned and undermentioned false representations of quality and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel. Upon information and belief, Trent Kirby had significant authority in the management and decision making that led to the sale of Paparazzi's products with dangerous levels of lead and nickel. Despite this knowledge,

Defendant Trent Kirby disregarded those dangers, unjustly enriching himself through the multilevel-marketing compensation structure of Paparazzi.

27.     Defendant Chantel Reeve is a co-founder of Paparazzi. Chantel Reeve is a resident and citizen of the State of Utah Upon information and belief, Chantel Reeve knew of the aforementioned and undermentioned false representations of quality and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel. Upon information and belief, Chantel Reeve had significant authority in the management and decision making that led to the sale of Paparazzi's products with dangerous levels of lead and nickel. Despite this knowledge, Defendant Chantel Reeve disregarded those dangers, unjustly enriching herself through the multilevel-marketing compensation structure of Paparazzi.

28.     Defendant Ryan Reeve is a co-founder of Paparazzi. Ryan Reeve is a resident and citizen of the State of Utah. Upon information and belief, Ryan Reeve knew of the aforementioned and undermentioned false representations of quality and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel. Upon information and belief, Ryan Reeve had significant authority in the management and decision making that led to the sale of Paparazzi's products with dangerous levels of lead and nickel.  Despite this knowledge, Defendant Ryan Reeve disregarded those dangers, unjustly enriching himself through the multilevel-marketing compensation structure of Paparazzi. (Collectively, Defendants Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve are herein referred to as "Paparazzi Cofounders.")

29.     At all times relevant herein, Paparazzi, LLC and the aforementioned Paparazzi Cofounders engaged in the business of purchasing, importing, marketing, warranting, distributing, and selling jewelry and accessories throughout the United States.

## SUBSTANTIVE ALLEGATIONS

### PAPARAZZI'S MULTI-LEVEL MARKETING SALES CONSULTANTS

30.     Paparazzi is a multi-level marketing company that sells budget jewelry through a network of salespeople, also known as "Consultants."

31.     Consultants earn money based on commissions, bonuses, and other incentive awards based on the quantity of Paparazzi jewelry they resell to their customers. Paparazzi claims that its Consultants receive 35%-45% gross profit from each item sold.[3]

32.     Consultants also earn money based on recruiting additional Consultants to sell Paparazzi products.

33.     Each Paparazzi Consultant must be "sponsored" by another Consultant. Consultants receive bonuses based on the quantity of products they sell, as well as products sold by Consultants that they sponsor. Most Consultants receive an average monthly bonus of $23.90.[4]

34.     Paparazzi encourages Consultants to purchase large collections of inventory to resell to their customers. Paparazzi markets the business to Consultants as "[j]ust like having your own private boutique filled with irresistible $5 accessories."[5]

35.     Paparazzi uses aggressive marketing tactics to encourage Consultants to purchase—and keep purchasing—more and more Paparazzi products with the promise of substantial financial gain.

36.     New Consultants are required to purchase a "Starter Kit" of jewelry, which range in cost from $99 to $499, and contain up to 200 pieces of Paparazzi products.[6] Paparazzi

---

[3] https://paparazziaccessories.com/media/static/site/documents/paparazzi-incomedisclosurestatement.pdf.
[4] *Id.*
[5] https://paparazziaccessories.com/.

encourages Consultants to sell their products "directly to friends, neighbors, family members, co-workers, and more," as well as to recruit additional Consultants to earn commissions from their sales, and to set up a personalized website where customers can "feed their $5 habit 24 hours a day."[7]

37.     Paparazzi's accessories are generally small pieces of costume jewelry, consisting largely of small-sized earrings and rings that would only tend to fit children.

38.     Paparazzi additionally designed and developed a "Lil Diva" line of costume jewelry accessories to be marketed at retail for only one dollar, substantially less than the five-dollar cost for its "regular" accessories.[8]

## PAPARAZZI REPRESENTS TO THE PUBLIC AND ITS CONSULTANTS THAT ITS PRODUCTS ARE LEAD-FREE AND NICKEL-FREE

39.     Beginning on October 18, 2017, if not earlier, Paparazzi directly advertised to consumers and its Consultants that all of its products are "Lead-free and nickel-free.":[9]

---

*Footnote continued from previous page*
[6] https://paparazziaccessories.com/join/.
[7] https://paparazziaccessories.com/starter-kits/#why.
[8] *See, e.g.,* https://asophisticatedfinishboutique.com/collections/frontpage
[9] https://web.archive.org/web/20171018063155/https://paparazziaccessories.com/about/
(Paparazzi "About" website, dated October 18, 2017). The "Wayback Machine" website is an Internet archive website. It periodically takes "snapshots" of websites for historical reference.



40.     Although Paparazzi's website changed from time to time, through and including at least November 20, 2021, Paparazzi maintained its representations to consumers and its Consultants that all of its products are "Lead-free and nickel-free.":[10]

---

[10] https://web.archive.org/web/20211120162630/https://paparazziaccessories.com/about/



## LEAD, NICKEL, AND CADMIUM ARE DANGEROUS TO THE PUBLIC HEALTH, ESPECIALLY CHILDREN

41.     The US Department of Health and Human Services ("HHS"), Centers for Disease Control ("CDC"), National Institute for Occupational Safety and Health ("NIOSH"), and Agency for Toxic Substances and Disease Registry ("ATSDR," a sub-entity of the CDC) all agree: lead is exceedingly dangerous. Even if a person is exposed for only a short period of time, and even through only skin contact, a person may experience abdominal pain, constipation, headaches, irritability, loss of appetite, memory loss, pain or tingling in the hands and/or feet, and general weakness.[11]

42.     Lead is particularly dangerous because when a person is exposed to lead, it is absorbed by the human body and stored in human tissue, including in the bones and blood. Worse yet, because the body stores the lead internally, it acts as a source of continual internal

---

[11] *See, e.g.,* https://www.cdc.gov/niosh/topics/lead/health.html; https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=96&tid=22; https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=92&toxid=22.

exposure. Thus, as bones naturally demineralized and replenish over time, and additional internal releases of lead occur from the replacement of bone tissue.[12]

43.     Children are particularly susceptible to the ill-effects of lead. Children tend to show signs of severe lead toxicity at lower levels than adults because they often put their hands and other objects that can have lead dust on them in their mouths. Because lead is absorbed internally, growing children bodies act to both absorb more lead as well as act as a greater source of amplification of the internal lead re-exposure, as explained above. And because children are still developing their brains and central nervous systems, children are especially susceptible to long-term nervous system damage, including irreversible brain damage.[13]

44.     Similarly, the HHS, CDC, NIOSH, and ATSDR agree that nickel is a known human toxin.[14] Nickel can enter a human's bloodstream by simple skin contact. After nickel enters the body, it can go to all organs, but it mainly goes to the kidneys. The most serious harmful health effects from exposure to nickel are chronic bronchitis, reduced lung function, and cancer of the lung and nasal sinus. HSS has determined that nickel metal may reasonably be anticipated to be a carcinogen, and multiple nickel compounds are known human carcinogens.[15]

45.     Cadmium is also a toxin according to HHS, CDC, NIOSH, and ATSDR.[16] Cadmium is classified by HSS as a known carcinogen. Common injuries for cadmium exposure include kidney and lung damage. Animal studies indicate that younger children absorb more

---

[12] *Id.*

[13] *Id.; see also* https://www.stanfordchildrens.org/en/topic/default?id=lead-poisoning-in-children-90-P02832.

[14] *See, e.g.,* https://www.cdc.gov/niosh/topics/nickel/default.html; https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=245&tid=44.

[15] https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=243&toxid=44.

[16] *See, e.g.,* https://www.cdc.gov/biomonitoring/Cadmium_FactSheet.html; https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=48&tid=15.

cadmium than adults do because they are more susceptible to loss of bone and decreased bone strength from exposure to cadmium.[17]

<u>PRODUCT SAFETY ADVOCATES TEST PAPARAZZI PRODUCTS, WHICH SHOW HIGH LEVELS OF LEAD, NICKEL, AND CADMIUM</u>

46.     In early December 2021, a group of ex-Paparazzi Consultants announced the results of lab testing they had commissioned on the jewelry by a third-party testing facility, Waypoint Analytical. The results were astounding and tragic. These results confirmed Consultants' worst fears about the pieces of jewelry. Pieces of Paparazzi accessories tested positive for arsenic, cadmium, lead, and nickel. All ten pieces of Paparazzi accessories that were tested were above California's Proposition 65 safe harbor levels of hazardous materials:[18]

**Waypoint**
ANALYTICAL

28534

2790 Whitten Road, Memphis, TN 38133
Main 901.213.2400 ◦ Fax 901.213.2440
www.waypointanalytical.com

Project        Jewelry Testing
Information :

Report Date : 01/03/2022
Received : 12/16/2021

*Rendell H. Thomas*

Randy Thomas
Project Manager

Report Number : **21-350-0202**

**REPORT OF ANALYSIS**

Lab No :     **99419**
Sample ID : **Paparazzi Camera Chic Black Bracelet**

Matrix: **Solids**
Sampled: **12/15/2021 11:30**

| Test | Results | Units | MQL | DF | Date / Time Analyzed | By | Analytical Method |
|------|---------|-------|-----|----|--------------------|----|-----------------|
| Antimony | <56.2 | mg/Kg | 56.2 | 100 | 12/28/21 01:06 | EAL | 6010D |
| Arsenic | <56.2 | mg/Kg | 56.2 | 100 | 12/28/21 01:06 | EAL | 6010D |
| Cadmium | <11.2 | mg/Kg | 11.2 | 100 | 12/28/21 01:06 | JADS | 6010D |
| Lead | **1130** | mg/Kg | 33.7 | 100 | 12/28/21 01:06 | EAL | 6010D |
| Nickel | **1900** | mg/Kg | 28.1 | 100 | 12/28/21 01:06 | EAL | 6010D |

---

[17] https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15
[18] https://www.facebook.com/crackthecrown/;
https://www.facebook.com/111929437944986/posts/136224162182180/?d=n.

47.     Soon thereafter, a public safety advocate, Tamara Rubin, who hosts a website named "Lead Safe Mama," similarly revealed the broad extent to which Paparazzi's accessories contain dangerous levels of lead, nickel, and cadmium. Over the course of less than two months, she sent out for testing over two dozen various products marketed and sold by Paparazzi through its Consultants.[19] Of those tests, *all* results had unsafe levels of at least one of the known toxins of lead, nickel, or cadmium—and many had unsafe levels of all three substances.[20] Some of the products tested for high levels of mercury and arsenic as well.[21]

<u>PAPARAZZI REMOVES ALL REFERENCES FROM ITS WEBSITE THAT ITS PRODUCTS ARE LEAD FREE AND NICKEL FREE</u>

48.     In an abrupt reversal, after the revelation of the Waypoint Analytical independent testing, on or about January 9, 2022, Paparazzi removed all references to its products being "Lead-free and nickel-free.":[22]

---

[19] https://tamararubin.com/category/paparazzi/ .

[20] *Id.*

[21] *See* https://tamararubin.com/2022/02/paparazzi-accessories-childs-ring-pink-enamel-heart-33700-ppm-cadmium-1234-ppm-antimony-both-cause-cancer-568-ppm-mercury-121-ppm-arsenic/; https://tamararubin.com/2022/01/golden-colored-paparazzi-dangly-earrings-3578-ppm-mercury-1658-ppm-lead-334-ppm-cadmium-842-ppm-arsenic/; https://tamararubin.com/2022/01/blue-tint-faux-pearl-bracelet-with-small-silver-spacers-1750-ppm-mercury-in-the-spacers-this-is-an-alarming-amount-of-mercury-also-positive-for-cadmium-nickel-and-arsenic/.

[22] https://web.archive.org/web/20220109184940/https://paparazziaccessories.com/about/



PAPARAZZI ATTEMPTS TO WHITEWASH THE TRUTH TO CONSUMERS AND CONSULTANTS

49.     Rather than accept accountability for its actions after the testing became public, Paparazzi doubled down on its prior representations of safety through further, and ongoing, false representations on its website.

50.     On December 23, 2021, Paparazzi posted a "Q&A" response to the question "WHAT IS THE JEWELRY MADE OF?" stating:[23]

---

[23] https://web.archive.org/web/20220104213825/https://paparazzi-accessories.helpscoutdocs.com/article/38-what-is-the-jewelry-made-of

# WHAT IS THE JEWELRY MADE OF?



Paparazzi jewelry meets applicable consumer safety laws and regulations in the United States. The metals found in Paparazzi Accessories pieces are primarily made of iron and include other trace minerals. Those trace minerals are made up of a metallic alloy of either zinc, steel, or aluminum. Before our jewelry is sold, Paparazzi tests its jewelry for chemicals of concern using labs that are accepted by the United States Consumer Products Safety Commission.  Paparazzi jewelry is required to undergo testing for compliance with California's Proposition 65, which includes testing for all heavy metals including lead, nickel, cadmium as well as phthalates. California's Proposition 65 is one of the most stringent consumer laws in the US, and Paparazzi's jewelry complies with Proposition 65.

Paparazzi Accessories are not hypo-allergenic.

Some of the Paparazzi products are made of actual leather, while others are made from synthetic leather or suede, which is a mix of plastics and fabric. It is the same type of material found in many shoes, jackets, and other apparel.  While some people may be more sensitive to the smell of these items, it is not harmful. Removing the bracelets from the plastic they are packaged in will help the smell dissipate more quickly if desired.

Some of the bracelets and rings may have latex in the elastic/stretch band. Paparazzi recommends that those persons with sensitivity to latex buy the suede or leather bracelets instead.

51.     Among other representations, Paparazzi affirmatively stated that it "meets applicable consumer safety laws and regulations in the United States."[24] Further, Paparazzi represented that it "tests its jewelry for chemicals of concern using labs that are accepted by the United States Consumer Products Safety Commission." Paparazzi represented that "Paparazzi jewelry is required to undergo testing for compliance with California's Proposition 65, which includes testing for all heavy metals including lead, nickel, cadmium as well as phthalates. … and Paparazzi's jewelry complies with Proposition 65."[25]

---

[24] *Id.*
[25] *Id.* (emphasis added).

52.     California's Proposition 65 requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects or other reproductive harm.[26]  A list of chemicals and substances covered by California's Proposition 65 disclosure requirement has been amended annually since 1986.[27]

53.     Proposition 65 has required the disclosure of items that contain lead and lead compounds since February 27, 1987.[28] The maximum "safe harbor" level for oral toxicity is 15μg (micrograms) per day.[29] The maximum safe harbor level for reproductive toxicity, however, is far lower at 0.5μg (micrograms) per day.[30]

54.     Items containing nickel have been covered by Proposition 65 since October 1, 1989.[31]

55.     Items containing cadmium and cadmium compounds have been covered by Proposition 65 since October 1, 1987.[32] The maximum "safe harbor" level for cancer toxicity is 0.05μg (micrograms) per day.[33]

56.     On March 3, 2022, Paparazzi updated its "Q&A" response to the question "WHAT IS THE JEWELRY MADE OF?" stating:[34]

---

[26] https://oehha.ca.gov/proposition-65/about-proposition-65
[27] *Id.*
[28] https://oehha.ca.gov/proposition-65/proposition-65-list
[29] https://oehha.ca.gov/proposition-65/chemicals/lead-and-lead-compounds
[30] *Id.*
[31] https://oehha.ca.gov/proposition-65/proposition-65-list
[32] *Id.*
[33] https://oehha.ca.gov/proposition-65/chemicals/cadmium-and-cadmium-compounds
[34] https://paparazzi-accessories.helpscoutdocs.com/article/38-what-is-the-jewelry-made-of

# WHAT IS THE JEWELRY MADE OF? 

Paparazzi jewelry meets applicable consumer safety laws and regulations in the United States. The metals found in Paparazzi Accessories pieces are primarily made of iron and include other trace minerals. Those trace minerals are made up of a metallic alloy of either zinc, steel, or aluminum. Before our jewelry is sold, Paparazzi tests its jewelry for chemicals of concern using labs that are accepted by the United States Consumer Products Safety Commission.

Paparazzi Accessories are not hypo-allergenic.

Some of the Paparazzi products are made of actual leather, while others are made from synthetic leather or suede, which is a mix of plastics and fabric. It is the same type of material found in many shoes, jackets, and other apparel.  While some people may be more sensitive to the smell of these items, it is not harmful. Removing the bracelets from the plastic they are packaged in will help the smell dissipate more quickly if desired.

Some of the bracelets and rings may have latex in the elastic/stretch band. Paparazzi recommends that those persons with sensitivity to latex buy the suede or leather bracelets instead.

57.     Although the updated "Q&A" response continues to represent that its jewelry is tested by labs accepted by the U.S. Consumer Product Safety Commission, it removed any reference to compliance with California Proposition 65.

<u>INDEPENDENT TESTING SHOWS HIGH LEVELS OF LEAD, NICKEL, AND CADMIUM IN PAPARAZZI'S JEWELRY</u>

58.     The University of Utah undertook testing of 40 pieces of Paparazzi's jewelry that Plaintiff Lori Teske purchased as a Paparazzi consultant and did not sell.

59.     *Every* sample tested positive for nickel. This is in direct contradiction to Paparazzi's representations otherwise. One sample tested in excess of 4400 mg per kilogram of nickel.

60.     Similarly, *every* sample tested positive for lead. This is in direct contradiction to Paparazzi's representations otherwise. One sample tested in excess of 29,000 mg per kilogram of lead. In other words, nearly *three percent* of the whole sample was lead.

61.     And *every* sample tested positive for cadmium. One sample tested in excess of 961,000 milligrams per kilogram of cadmium. In other words, *nearly the entire sample*, roughly 96%, was pure cadmium. Several other samples tested in excess of 60% pure cadmium.

62.     The University of Utah also undertook testing of 16 pieces of Paparazzi's jewelry that remained in the possession of Plaintiff Terri Franklin.

63.     *Every* sample tested positive for nickel and for lead.  This is in direct contradiction to Paparazzi's representations otherwise.

64.     And *every* sample tested positive for cadmium. One sample tested in excess of 735,000 milligrams per kilogram of cadmium. In other words, *over two-thirds of the entire sample*, roughly 73.5%, was pure cadmium. Several other samples tested in excess of 55% pure cadmium.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

65.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated under Federal Rule of Civil Procedure 23.  They seek to represent a Class defined of:

> All Paparazzi Consultants who sold Paparazzi accessories from the beginning of any applicable statute of limitations period until December 16, 2021.

Excluded from both the Class and the Subclasses are any entities or persons named as Defendants in this action, as well as the judge assigned to this case.

66.     Plaintiffs meet the prerequisites of Rule 23(a):

a.      **Numerosity**.  On information and belief, there are more than 60,000 Class members.  The members of the Class and each Subclass are thus so numerous that joinder of all Class members in this action is not practical.

b.      **Commonality**.  The answers to questions common to the Class and Subclasses will drive the resolution of this litigation.  The common questions of law and fact include:

A.      whether Paparazzi manufactured or sold jewelry and accessories that contained lead and nickel;

B.      whether Paparazzi manufactured or sold jewelry and accessories that contained nickel;

C.      whether Paparazzi manufactured or sold jewelry and accessories that contained dangerous levels of cadmium;

D.      whether Paparazzi manufactured or sold jewelry and accessories that contained other toxic metals;

E.      whether, and to what extent, Paparazzi's Cofounders knew about the Toxic Metals content of Paparazzi's accessories;

F.      whether Paparazzi's distribution of accessories containing Toxic Metals to Consultants substantially injured Consultants' business reputations;

G.      whether the Paparazzi's Lanham Act violations have injured the goodwill and reputation of Consultants;

H.      whether Paparazzi's distribution of accessories containing Toxic Metals to Consultants led the public to believe the Consultants were engaged in illegal conduct;

I.      whether Paparazzi's advertising on behalf of Consultants that Paparazzi's accessories lacked lead and nickel content constitutes a violation of the Lanham Act;

J.      whether Paparazzi's advertising on behalf of Consultants that Paparazzi's accessories complied with California Proposition 65's disclosure requirements constitutes a violation of the Lanham Act;

K.      the extent of Defendants' profits earned as a result of falsely designating Paparazzi's accessories as free of Toxic Metals;

L.      the form of injunction necessary to prevent Defendants from causing further harm to Consultants in violation of the Lanham Act;

M.      whether Paparazzi is a "merchant" with respect to Paparazzi's accessories under Utah Code § 70A-2-104(1);

N.      whether Paparazzi's accessories are "goods" within the meaning of Utah Code § 70A-2-105(1);

O.      whether Paparazzi's accessories are "consumer products," as that term is defined by 15 U.S.C. § 2301(1);

P.      whether Plaintiffs and proposed Class members are "consumers," as that term is defined by 15 U.S.C. § 2301(3);

Q.      whether Defendants are "warrantor[s]" and "supplier[s]," as those terms are defined by 15 U.S.C. § 2301(4) and (5);

R.      whether Defendants provided Plaintiffs and proposed Class members with "implied warranties," as that term is defined by 15 U.S.C. § 2301(7);

S.      whether Plaintiffs and proposed Class members entered into contracts with Paparazzi;

T.      whether Plaintiffs and proposed Class members did what their contract requires;

U.      whether the Paparazzi and Plaintiffs and proposed Class members entered a contract whereby Paparazzi agreed to provide its accessories;

V.      whether provision of jewelry accessories by Paparazzi to Plaintiffs and proposed Class members was an essential purpose of the contract;

W.      whether the Paparazzi breached its contract to Plaintiffs and the proposed Class members by Paparazzi's provision of jewelry and accessories with latent manufacturing defects containing lead and/or nickel and/or cadmium;

X.      whether it was reasonably apparent and knowable (or, conversely, latent) to plaintiffs and proposed Class members that Defendants' jewelry contained lead and/or nickel and/or cadmium;

Y.      whether Defendants injured Plaintiffs and the proposed Class members rights to receive their agreed-upon benefits under the contract;

Z.      whether Defendants' provision of lead- and nickel-containing accessories to Plaintiffs and Class members was inconsistent with the purpose and justified expectations of the parties in light of their written contracts;

c.      **Typicality.**  Plaintiffs have the same interests as all members of the Class they seek to represent, and Plaintiffs' claims arise out of the same set of facts and conduct as all other members of the Class.  Plaintiffs and all proposed Class members sold Paparazzi's accessories as Consultants that Defendants falsely represented as lead- and nickel-free. All of the claims of Plaintiffs and proposed Class members arise out of Defendants' conduct in marketing Paparazzi's accessories as lead- and nickel-free and in selling accessories that contained Toxic Metals.

d.   **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class members.  Plaintiffs' interests align with those of the class members, and Plaintiffs have no fundamental conflicts with the Class.  Plaintiffs have retained counsel competent and experienced in Lanham Act, complex commercial, and class action litigation who will fairly and adequately represent the Class.

67.   Plaintiffs meet the prerequisites of Rule 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.  Defendants' sale of products containing Toxic Metals, and its false advertisement of its accessories as lead- and nickel-free affected each Plaintiff and Class member in the same way.  And the Lanham Act provides for injunctive relief to prevent the Defendants from continuing to sell Paparazzi accessories that contain Toxic Metals to prevent further harm to each Plaintiff and Class member.

68.   Plaintiffs meet the prerequisites of Rule 23(b)(3):

a.   The common questions of law and fact enumerated above predominate over any questions affecting only individual members of the Class, and a class action is superior to other methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.

b.   Defendants are sophisticated parties with substantial resources, while proposed Class members generally are not, and prosecution of this litigation is likely to be expensive, as proved by the extensive scientific analysis that preceded the filing of this complaint.  Because the economic and reputational damages suffered by any individual Class member from any individual defendant may be relatively modest compared to the expense and

burden of individual litigation, it would be impracticable for proposed Class members to seek redress individually for Defendants' wrongful conduct.

## COUNT I

### Violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a))

69.     Plaintiffs hereby incorporate by reference the allegations of the foregoing paragraphs as though fully set forth herein.

70.     Section 43(a) of the Lanham Act provides in pertinent part: "Any person, who, on or in connection with any goods or services, or any container of goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. §1125(a)(1)(A)&(B).

71.     Plaintiffs and the Class, comprised entirely of independent Consultants and sellers of Defendants' accessories, have a reasonable and genuine interest to be protected against the Defendants' false designation of Paparazzi's accessories as lead- and nickel-free.

72.     Plaintiffs and the Class have a reasonable and genuine interest to be protected against the business reputational harm caused by Defendants by representing Paparazzi's accessories as lead- and nickel-free although the accessories were not lead- and nickel-free.

73.     Plaintiffs and the Class have a reasonable and genuine interest to be protected against Defendants' distribution of lead and nickel-containing accessories to Consultants that lead the public to believe the Consultants were engaged in illegal conduct.

74.     In violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1), Defendants profited from the sale Paparazzi's accessories that it advertised as lead- and nickel-free, although the accessories were not lead- and nickel-free.

75.     By marketing and selling Paparazzi's accessories as lead- and nickel-free, although the accessories were not lead- and nickel-free, Defendants are damaging the reputation and goodwill of the Consultants, to the detriment of Plaintiffs and the Class.

76.     By marketing and selling Paparazzi's accessories as lead- and nickel-free, although the accessories were not lead- and nickel-free, Defendants caused the public to believe that the Plaintiffs and the Class were engaged in illegal conduct.

77.     Plaintiffs and the Class are comprised of independent Consultants and sellers of Paparazzi's accessories who have been and continue to be damaged by Defendants' violations of the Lanham Act, and are therefore entitled to equitable relief, including a permanent injunction, disgorgement of profits, and damages in an amount to be proven at trial.  As a component of damages to be awarded, Plaintiffs and the Class request a substantial award to finance a national corrective advertising campaign to help remedy the harm that Defendants have caused to the goodwill and reputation to Plaintiffs and the Class.

78.     Given the egregious nature of the Defendants' false representation of Paparazzi's accessories as lead- and nickel-free, Plaintiffs and the Class seek an award of three times actual damages.

79.     Pursuant to 15 U.S.C. §1117(a), Plaintiffs and the Class are entitled to recover Defendants' profits earned through the sale of Paparazzi's accessories were falsely represented as lead- and nickel-free.

80.     As a direct and proximate result of their wrongful conduct as alleged above, Defendants have caused irreparable injury to Plaintiffs and the Class, and to their business, reputation, and goodwill, for which there is no adequate remedy at law.  As such, Plaintiffs and the Class are entitled to an injunction under 15 U.S.C. §1116 permanently restraining Defendants, both individually and collectively, from representing Paparazzi's accessories as lead- and nickel-free.

81.     Pursuant to 15 U.S.C.§ 1117, Plaintiffs and the Class seek to recover the cost of this action, and, because this case qualifies as exceptional, their reasonable attorneys' fees.

82.     Plaintiffs and the Class seek to hold Defendants jointly and severally liable for the lost profits of Plaintiffs and the Class and for corrective advertising necessary to restore the reputation and goodwill of Plaintiffs and the Class member's names.

## COUNT II

### Breach of Implied Warranty (Utah Code § 70A-2314)  (15 U.S.C. §§ 2301–2312)

83.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

84.     Plaintiffs bring this action on behalf of themselves and the proposed Class.

85.     Paparazzi was at all relevant times a "merchant" with respect to Paparazzi's accessories under Utah Code § 70A-2-104(1).

86.     Paparazzi's accessories are "goods" within the meaning of Utah Code § 70A-2-105(1).

87.     Paparazzi's accessories are "consumer products," as that term is defined by 15 U.S.C. § 2301(1).

88.     Plaintiffs and proposed Class members are "consumers," as that term is defined by 15 U.S.C. § 2301(3).

89.     Defendants are "warrantor[s]" and "supplier[s]," as those terms are defined by 15 U.S.C. § 2301(4) and (5).

90.     Defendants provided Plaintiffs and proposed Class members with "implied warranties," as that term is defined by 15 U.S.C. § 2301(7).

91.     In their capacity as warrantors and by the conduct described herein, any attempt by Defendants to limit the implied warranties in a manner that would exclude coverage of the misrepresented lead-and-nickel-containing Paparazzi's accessories is unconscionable and any such effort to disclaim, or otherwise limit, liability for the misrepresented Paparazzi's accessories is void.

92.     All jurisdictional prerequisites have been satisfied herein.

93.     The lead-and-nickel-containing properties are a result of the Paparazzi accessories material makeup and are not the product of any manufacturing flaw or alteration in the Paparazzi accessories after they were manufactured.  In other words, the lead-and-nickel-containing properties of the Paparazzi accessories existed at the point of design, manufacture, distribution, and sale.

94.     A warranty that the Paparazzi accessories were in merchantable condition and fit for the ordinary purpose for which costume jewelry accessories are used is implied by law pursuant to Utah Code § 70A-2-314.  This implied warranty of merchantability is part of the

basis for the bargain between Defendants, on the one hand, and Plaintiffs and proposed class members, on the other.

95.     Notwithstanding the aforementioned duty, at the time of delivery, Defendants breached the implied warranty of merchantability because Paparazzi's accessories are not fit for the ordinary purposes for which such goods are used and failed to conform to the standard performance of like products used in the trade.  This is so for the reasons stated above, namely that the Paparazzi accessories material makeup contained dangerous levels of lead and nickel.

96.     Defendants knew or should have known that Paparazzi's accessories posed a safety risk and were defective as designed and knew or should have known that selling the Paparazzi's accessories to Plaintiffs and proposed Class members as marketed as lead- and nickel-free constituted a breach of the implied warranty of merchantability.

97.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and proposed Class members bought Paparazzi's accessories without knowledge of their lead and nickel content or their serious safety risks.

98.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and proposed Class members purchased unsafe products which could not be used for their intended purpose as costume jewelry accessories.

99.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and proposed Class members have suffered damages and did not receive the benefit of their bargain.

100.    Defendants were unjustly enriched by keeping the profits for its unsafe products for years before quietly removing reference on its website that its products are lead and nickel free.

101.    Defendants conduct as described herein, including Defendants' knowledge of the lead and nickel content of Paparazzi's accessories and its action, and inaction, in the face of that knowledge, Defendants have failed to comply with its obligations under their written and implied promises, warranties, and representations.

102.    Defendants' breaches of the implied warranty of merchantability that damaged Plaintiffs and the proposed Class in an amount to be proven at trial.  Among other things, the market price of the product that Plaintiffs and the proposed Class members actually paid for (i.e., costume jewelry that actually was lead and nickel free) is higher than the market price of the product that Defendants provided (i.e., costume jewelry that contained lead and nickel). In fact, the product that Defendants provided, because of its lead and nickel content, is worthless. Additionally, Plaintiffs and proposed Class members are entitled to revoke their acceptance of the Paparazzi accessories, obtain damages and equitable relief, and obtain attorney's fees and costs pursuant to 15 U.S.C. § 2310.

103.    Plaintiffs and proposed Class members are also entitled to damages under Utah Code § 70A-2-714.

<u>**COUNT III**</u>

<u>**Breach of Contract**</u>

104.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

105.     Plaintiffs and proposed Class members entered uniform contracts with Paparazzi at various times to act as independent Consultants to sell Defendants' Paparazzi's accessories.

106.    Plaintiff Lori Teske entered her agreement with Paparazzi on  October 24, 2020.

107.    Plaintiff Terri Franklin entered her agreement with Paparazzi on June 30, 2019. .

108.    The contracts are binding and enforceable.

109.    Plaintiffs and proposed Class members did what the contract required: namely start an independent business and sell Defendants' Paparazzi's accessories.

110.    Paparazzi, in return, was to be the sole provider and seller to Plaintiffs and proposed Class members of saleable fashion jewelry accessories. Plaintiffs and proposed Class members are required to purchase "Starter Pack[ages]" of Paparazzi jewelry (Ex. A (Contract), § 3.3) and maintain a sufficient inventory of Paparazzi jewelry. *Id.* §3.7.

111.    Paparazzi breached the contract to Plaintiffs and proposed Class members by failing to provide saleable goods due to the presence of high levels of lead, nickel, and cadmium, and/or other Toxic Metals.

112.    By failing to provide saleable goods, Paparazzi's contract failed its essential purpose of allowing its Consultants (Plaintiffs and the proposed Class) to, in Paparazzi's own contractual words, "build[] confidence and financial freedom through [selling] affordable fashion." *Id.* §1.

113.    Each and every one of the Plaintiffs and proposed Class members were harmed by the Defendants' provision of non-saleable jewelry and accessories with latent defects, unknowable to Plaintiffs and proposed Class members as mere conduits as end-resellers of Defendants' products.

114.    Paparazzi's breach of contract to Plaintiffs and proposed Class members entitles them to damages as provided by Utah's iteration of the Uniform Commercial Code, namely Utah Code § 70A-2-719.  Under this section, Plaintiffs and proposed Class members are entitled to: 1) an award of damages in the amount equal the loss in the value to each of the plaintiffs and proposed Class members or return of the goods for a full refund, *and* 2) an additional award of

incidental and consequential damages due to the disparity in bargaining power between Paparazzi and Plaintiffs and proposed Class members.

**COUNT IV**

**Breach of Covenant of Good Faith and Fair Dealing**

115.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

116.    All contracts contain an unwritten or implied promise that the parties will deal with each other fairly and in good faith. Plaintiffs and proposed Class members and Defendants have promised not to intentionally do anything to injure each other's right to receive the benefits of the contract.

117.    Defendants violated this unwritten promise to Plaintiffs and proposed Class members by selling them products containing lead, nickel, cadmium, and/or other Toxic Metals, when Defendants represented and advertised to the public at large that Paparazzi's accessories are compliant with California Proposition 65 and are completely free of lead and nickel.

118.    Defendant's provision of products containing lead, nickel, cadmium and/or other Toxic Metals, was and is inconsistent with the purpose and justified expectations of Plaintiffs and proposed Class members in light of the contract language stating Paparazzi warrants against defects.

119.    Each and every one of the plaintiffs and proposed Class members were harmed by the Defendants' provision of jewelry and accessories with latent manufacturing defects, unknowable to plaintiffs and proposed Class members as mere conduits as end-resellers of Defendants' products.

120.    Plaintiffs and proposed Class members were damaged because Defendants breached the justified expectations of the parties by providing plaintiffs and proposed Class

members products that contain latent manufacturing defects for the aforementioned reasons of containing high levels of lead, nickel, cadmium, and/or other Toxic Metals.

121.     Defendants' breach of the Covenant of Good Faith and Fair Dealing entitles Plaintiffs and Class members to an award of damages in the amount equal the loss in the value to each of the plaintiffs and proposed Class members. The loss in value is equal to the profits that to each of the plaintiffs and proposed Class members would have earned had they sold each of the accessory pieces that Defendants sold to them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against Defendants and other relief as follows:

A.     Defendants and its agents, officers, employees, representatives, successors, assigns, attorneys and all other persons acting for, with, by and through, or under authority from the Defendants, and each of them, be permanently enjoined from representing paparazzi's accessories as lead or nickel free in describing, labeling, or packaging Defendants' own products, or advertising, promoting, marketing or selling the same.

B.     Pursuant to 15 U.S.C. § 1117, that Defendants be held jointly and severally liable for all damages suffered by Plaintiffs and the Class resulting from the acts alleged herein.

C.     That as a result of Defendants' deliberate, willful, and intentional conduct in violation of 15 U.S.C. § 1125(a), such damages be trebled.

D.     Pursuant to 15 U.S.C. § 1117, that Defendants be compelled to account for, and to disgorge, any and all of the profits derived by Defendants through illegal acts complained of herein.

E.      For an award of funds sufficient to carry out a national corrective advertising campaign to mitigate the reputational harm Defendants' wrongful conduct has caused, for which the Defendants shall be held jointly and severally liable.

F.      That Defendants be ordered, pursuant to 15 U.S.C. § 1118, to deliver up for destruction all containers, labels, signs, prints, packages, wrappers, receptacles, advertising, promotional material, and products, or the like in possession, custody or under the control of Defendants that are determined to violate Section 43 of the Lanham Act.

G.      That the Court declare this to be an exceptional case and award full costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

H.      For an award due to Defendants' breaches of the implied warranty of merchantability in the amount of the difference between the (worthless) value of the lead- and nickel-containing Paparazzi accessories and the market price of the product that Plaintiffs and the proposed Class members actually paid for: costume jewelry advertised as lead- and nickel-free.

I.      For an award of treble damages for breach the implied warranty of merchantability pursuant to Utah Code § 70A-2-714.

J.      That the Court award the lost profit value to plaintiffs and proposed Class members that they would have earned had they sold each of the accessory pieces that Defendants sold to them

K.      That the Court award the lost profit value to plaintiffs and proposed Class members that they would have earned had they sold each of the accessory pieces that Defendants sold to them based on the purpose and justified expectations in the parties' contracts.

L.      That the Court grant prejudgment and post-judgment interest.

M.      That the Court grant any other remedy to which Plaintiffs and the Class may be entitled as provided by law or equity.

N.      For such other and further relief, including costs and attorneys' fees, as allowed by law and as the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiffs respectfully demand a trial by jury on all claims and issues so triable.


Dated:  June 6, 2022                **MAGLEBY CATAXINOS & GREENWOOD, P.C.**

By:   */s/ Adam Alba*
Adam Alba
141 W. Pierpont Ave.
Salt Lake City, Utah 84101
866.928.7962
alba@mcg.law


**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

Jason L. Lichtman
Daniel E. Seltz
Daniel R. Leathers
250 Hudson Street, 8th Floor
New York, NY 10013
212.355.9500

Andrew R. Kaufman
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
615.313.9000

*Pro Hac Vice applications forthcoming*

*Attorneys for Plaintiff*